DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

**ALLAN J. DINNERSTEIN M.D., P.A.,** and **ALLAN J. DINNERSTEIN, M.D.,**
Appellants,

v.

**FLORIDA DEPARTMENT OF HEALTH,**
Appellee.

No. 4D17-2289

[ September 26, 2018 ]

Appeal from the Circuit Court for the Fifteenth Judicial Circuit, Palm Beach County; Cymonie Rowe, Judge; L.T. Case No. 502009CA007760.

Robert M. Presley of Presley and Presley, P.A., Wellington, for appellants.

Pamela Jo Bondi, Attorney General, Tallahassee, and Shane Weaver, Senior Assistant Attorney General, West Palm Beach, for appellee.

TAYLOR, J.

Allan J. Dinnerstein, M.D. and his professional association, Allan J. Dinnerstein, M.D., P.A., appeal the trial court's judgment in favor of the Florida Department of Health ("FDOH"), which resulted in the denial of appellants' sovereign immunity claim in a medical malpractice action. Appellants based their claim of immunity on their alleged participation in Florida's Volunteer Healthcare Provider Program. For the reasons stated below, we affirm.

Earlier, appellants had obtained summary judgment declaring that they were entitled to sovereign immunity in the medical malpractice action. However, FDOH appealed, and we reversed summary judgment after concluding that triable issues existed regarding whether Dr. Dinnerstein was acting in his capacity as a volunteer physician when he treated the patient. *Fla. Dep't of Health v. Allan J. Dinnerstein, M.D., P.A.*, 78 So. 3d 26 (Fla. 4th DCA 2011).

Our decision in *Dinnerstein* succinctly summarizes the underlying facts that led to the appeal:

> In 2005, Dr. [Allan] Dinnerstein, M.D., through his corresponding professional association, entered into a contract with the defendant, the Florida Department of Health, whereby he agreed to participate in Florida's Volunteer Healthcare Provider Program. The Legislature enacted this program in section 766.1115, Florida Statutes, to improve the access of indigent residents to health care by offering health care providers immunity from suit for their agreement to offer free health care to indigent residents. *See* § 766.1115(2), Fla. Stat. (2005). A volunteer provider may not be named as a defendant in any malpractice action where the care is performed under the health care provider's contract with the Department. § 766.1115(4), Fla. Stat. (2005).
>
> The statute mandates that "[p]atient selection and initial referral must be made solely by the governmental contractor, and the provider must accept all referred patients." § 766.1115(4)(d), Fla. Stat. (2005). "If emergency care is required, the patient need not be referred before receiving treatment, but must be referred within 48 hours after treatment is commenced or within 48 hours after the patient has the mental capacity to consent to treatment, whichever occurs later." § 766.1115(4)(e), Fla. Stat. (2005). The Department's standard contract, signed by Dr. Dinnerstein, contains language based on the statutory language of section 766.1115(4)(e). It requires that a designated agent of the Department must make the referral pursuant to Patient Referral Form, DH 1032, and the health care provider must obtain the approval of the Department prior to delivery of services. Consistent with the statute, the contract included the statutory language regarding emergency treatment.
>
> The Patient Referral Form, DH 1032, informs the patient that the services of the volunteer health care professional are being provided at no charge and that the state is solely liable for any injuries and damages with its liability being limited by sovereign immunity. The patient must sign the form agreeing to the referral.
>
> Diane Carlson, a nurse employed with the Palm Beach County Health Department, was in charge of the Volunteer

Health Care Provider Program. Ms. Carlson testified that when Dr. Dinnerstein signed the contract, he was in private practice. However, Dr. Dinnerstein called Ms. Carlson, informing her that he was going to start working at Bethesda Memorial Hospital and that he was going to draw down on his private practice. Dr. Dinnerstein said that he no longer wanted to accept patients from the network. Nonetheless, Dr. Dinnerstein never withdrew from the network and his volunteer contract was still in effect in March 2007.

In 2007, Ludana Prophete was a patient receiving prenatal care at the Lantana clinic of the Palm Beach County Health Department, a designated agency for the Department. On March 5, 2007, Ms. Prophete arrived by ambulance at Bethesda Memorial Hospital in Palm Beach County, complaining of abdominal pain. This appears to be a self-referral and not one made by the clinic. Dr. Dinnerstein has not claimed that he is covered by immunity for his treatment of Ms. Prophete on this date. A nurse made a diagnosis that Ms. Prophete had potential preeclampsia. Dr. Dinnerstein was the physician on call at Bethesda, and he initially saw Ms. Prophete and rendered some treatment. Upon discharge, Ms. Prophete was instructed to return if she experienced other problems. She was also told to keep her next appointment with the Lantana clinic.

On March 8, 2007, Ms. Prophete went to the Lantana clinic for her appointment, where she was seen by a nurse, Sandra Smith. Based upon her examination and Ms. Prophete's complaints, Smith believed that Ms. Prophete was suffering from preeclampsia, which required immediate delivery. Smith called the Labor and Delivery Unit at Bethesda and notified the clerk of Ms. [Prophete's] situation. Smith then arranged for an ambulance to take Ms. Prophete to Bethesda, because that is where the clinic routinely sends its patients requiring hospitalization. On a prescription pad which Smith gave to the paramedics, Smith noted Ms. Prophete's vital signs as well as her symptoms. Smith did not know which physician was on duty, nor did she speak to any doctor regarding Ms. Prophete. She has no responsibility for referring patients to doctors pursuant to the volunteer health program.

Dr. Dinnerstein saw Ms. Prophete at Bethesda on March 8th, where her blood pressure was elevated. He gave her two

prescriptions and told her to return the next day to get her blood pressure checked. She returned on March 9th, and Dr. Dinnerstein again examined her and released her, this time instructing her to return in two days to have her blood pressure checked. Unfortunately, Ms. Prophete died two hours after leaving the hospital. Dr. Dinnerstein never billed for his services, although Bethesda did generate a bill, which was later written off as uncollectable.

*Dinnerstein*, 78 So. 3d at 26–28.

After winning the first appeal, FDOH brought a crossclaim against appellants in the underlying medical malpractice action, seeking a declaration that appellants were not under FDOH contract to provide services to Ms. Prophete and, thus, should not be afforded sovereign immunity protection in the medical malpractice action brought against them by the estate of Ms. Prophete. Appellants filed a counterclaim alleging breach of contract and seeking relief against FDOH for declining to afford appellants sovereign immunity protection.

Appellants moved for summary judgment, arguing that Dr. Dinnerstein's compensation arrangement with the hospital where the patient was treated did not impair his right to receive sovereign immunity and that FDOH had anticipatorily breached the parties' agreement under the volunteer provider contract. FDOH also moved for summary judgment, asserting that it had no legal obligation under the parties' volunteer provider contract to extend sovereign immunity to Dr. Dinnerstein for two reasons: (1) the services he provided to Ms. Prophete were not "volunteer, uncompensated services" under Florida law because he was compensated for her treatment through his contract with the hospital, and (2) he failed to obtain a completed referral for the treatment from Ms. Prophete, although she was competent to sign and understand it.

The version of Chapter 766 in effect at the time appellant entered into his contract with FDOH states, in relevant part:

> "Contract" means an agreement executed in compliance with this section between a health care provider and a governmental contractor. This contract shall allow the health care provider to deliver health care services to low-income recipients as an agent of the governmental contractor. *The contract must be for volunteer, uncompensated services. For services to qualify as volunteer, uncompensated services under this section, the health care provider must receive no*

4

*compensation from the governmental contractor for any services provided under the contract and must not bill or accept compensation from the recipient, or any public or private third-party payor, for the specific services provided to the low-income recipients covered by the contract.*

§ 766.1115(3)(a), Fla. Stat. (2005) (emphasis added). The statute further adds:

(4) CONTRACT REQUIREMENTS.--A health care provider that executes a contract with a governmental contractor to deliver health care services on or after April 17, 1992, as an agent of the governmental contractor is an agent for purposes of s. 768.28(9), while acting within the scope of duties under the contract, if the contract complies with the requirements of this section and regardless of whether the individual treated is later found to be ineligible. A health care provider under contract with the state may not be named as a defendant in any action arising out of medical care or treatment provided on or after April 17, 1992, under contracts entered into under this section. The contract must provide that:

[. . . .]

(d) Patient selection and initial referral must be made solely by the governmental contractor, and the provider must accept all referred patients. However, the number of patients that must be accepted may be limited by the contract, and patients may not be transferred to the provider based on a violation of the antidumping provisions of the Omnibus Budget Reconciliation Act of 1989, the Omnibus Budget Reconciliation Act of 1990, or chapter 395.

(e) *If emergency care is required, the patient need not be referred before receiving treatment, but must be referred within 48 hours after treatment is commenced or within 48 hours after the patient has the mental capacity to consent to treatment,* whichever occurs later.

§ 766.1115(4)(d)–(e), Fla. Stat. (2005) (emphasis added).

After a hearing on the motions for summary judgment, the trial court entered an order denying appellants' motion and granting FDOH's motion. The court found that it was undisputed that: (1) the patient was not

referred by FDOH pursuant to section 766.1115(4)(e); (2) Dr. Dinnerstein was paid by Bethesda for the specific and same type of services that were afforded to the patient; and (3) Bethesda was not a contracted volunteer with FDOH.

The trial court concluded that when Dr. Dinnerstein treated the patient at Bethesda, he was contracted to do so and was compensated pursuant to his contract with Bethesda; thus, the subject care was not provided on a volunteer basis. Consequently, the court found that FDOH did not breach its volunteer provider contract with appellants and declined to reach the issue of whether an anticipatory breach occurred.

On appeal, appellants contend that summary judgment for FDOH was in error because: (1) the trial court improperly weighed the evidence and viewed the facts in the light most favorable to FDOH; (2) FDOH anticipatorily breached the contract with appellants; and (3) the evidence obtained after the prior appeal resolved the outstanding factual questions in appellants' favor. We disagree.

We review the trial court's order granting summary judgment de novo. *Fla. Atl. Univ. Bd. of Trs. v. Lindsey*, 50 So. 3d 1205, 1206 (Fla. 4th DCA 2010). Summary judgment is appropriate only where "there is no genuine issue of material fact and if the moving party is entitled to a judgment as a matter of law." *Volusia Cty. v. Aberdeen at Ormond Beach, L.P.*, 760 So. 2d 126, 130 (Fla. 2000). "[T]he burden is upon the party moving for summary judgment to show conclusively the complete absence of any genuine issue of material fact," and "the trial court must draw every possible inference in favor of the party against whom summary judgment is sought." *Albelo v. S. Bell*, 682 So. 2d 1126, 1129 (Fla. 4th DCA 1996) (citing *Moore v. Morris*, 475 So. 2d 666 (Fla. 1985)).

The trial court found that appellants were not "voluntary and uncompensated" providers because they were compensated for Ms. Prophete's treatment through their Bethesda contract and because Bethesda billed for that treatment. To resolve the sovereign immunity issue in this case, however, we need not decide whether the trial court correctly determined that Dr. Dinnerstein's employment and compensation under his contract with Bethesda precluded his eligibility for immunity under the Volunteer Health Care Program. Here, summary judgment for FDOH and against appellant was appropriate because there was no evidence showing that Ms. Prophete was ever even a patient in the volunteer program. *See Bueno v. Workman,* 20 So. 3d 993, 998 (Fla. 4th DCA 2009) ("Under the tipsy coachman rule, 'if a trial court reaches the right result, but for the wrong reasons, it will be upheld if there is any

6

basis which would support judgment in the record.' ") (quoting *Dade Cty. Sch. Bd. v. Radio Station WQBA,* 731 So. 2d 638, 644 (Fla. 1999)).

As we pointed out in our *Dinnerstein* opinion, which reversed the initial summary judgment for appellants, a threshold factual issue remained as to whether Dr. Dinnerstein was acting within his capacity as a volunteer physician when he treated Ms. Prophete. 78 So. 3d at 29. This issue turned on whether Ms. Prophete's referral was made to Dr. Dinnerstein through the volunteer program, by way of emergency or the normal referral process. *Id.* It was undisputed that no referral was made using the normal referral process or within forty-eight hours from the commencement of emergency treatment. *Id.* Therefore, for the emergency provision to apply, a referral had to have been obtained within forty-eight hours after Ms. Prophete had the mental capacity to consent to treatment. *Id.* at 29-30. We explained as follows:

> Here, it is clear that no referral was executed within forty-eight hours after treatment was commenced on March 8th. Thus, the emergency provision could apply only if a referral was obtained "within 48 hours after the patient has the mental capacity to consent to treatment." If Ms. Prophete had the mental capacity to consent to the terms of treatment in the volunteer network, either on March 8th or March 9th, then the referral requirement was not "dispensed with." Here, as the Department argues, Ms. Prophete was *discharged* from Bethesda Memorial Hospital on both March 8th and March 9th, suggesting that she would have had the mental capacity to consent to treatment. The fact that Dr. Dinnerstein discharged her two days in a row cuts against his argument below that there was no opportunity for Ms. Prophete to sign the referral form and thus consent to her treatment by him as a volunteer physician.

*Dinnerstein,* 78 So. 3d at 29–30.

Appellants never established that Ms. Prophete lacked the requisite mental capacity to consent to treatment. We stated the following in *Dinnerstein*:

> Under the contract, if the patient had the mental capacity to consent to treatment, the fact that the patient died within the forty-eight hour period from the commencement of treatment would not excuse the lack of a referral. If Ms. Prophete did have the mental capacity to consent, then the

7

requirement of executing the referral form is crucial, because it informs the patient that sovereign immunity would be extended to the health care provider and she would be waiving her right to a full recovery in tort for any medical negligence. It is also mandated by statute.

*Dinnerstein*, 78 So. 3d at 29.

Although Ms. Prophete was a patient of FDOH's Lantana clinic, she was never shown to be associated with the volunteer program, let alone a patient referred through the volunteer program. Ms. Prophete was not informed of and did not consent to participate in the volunteer program. The nurse who prepared her transportation to Bethesda did not have any role with the volunteer program and did not refer Ms. Prophete to a specific doctor at Bethesda as a part of the program. Ms. Prophete happened to be a patient at the Lantana clinic, and the nurse merely used her customary practice of sending clinic patients—with their vitals—to Bethesda for delivery. Because the evidence failed to show that Ms. Prophete was a patient in the volunteer program, Dr. Dinnerstein's treatment of her was not shown to have been as a part of the volunteer program.

In sum, the undisputed facts establish that Dr. Dinnerstein never obtained a referral for Ms. Prophete or her consent to treatment under the volunteer program, and, as such, FDOH did not have a duty to afford him sovereign immunity under the Act. FDOH, therefore, did not breach the parties' contract when it declined to do so. Accordingly, we affirm the final summary judgment orders entered in this case.

*Affirmed.*

WARNER and LEVINE, JJ., concur.

\* \* \*

**_Not final until disposition of timely filed motion for rehearing._**

8